[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13849
Non-Argument Calendar

_____

Agency No. A216-267-806

KIMBA P. NGANA,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(August 26, 2020)

Before BRANCH, LUCK, and FAY, Circuit Judges.

PER CURIAM:

Kimba P. Ngana, a native and citizen of Angola, petitions for review of the

Board of Immigration Appeals' final order dismissing his appeal of the immigration

judge's denial of his application for asylum, withholding of removal, and protection under the Convention Against Torture.[1]  After careful review, we deny his petition.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In November 2017, Ngana entered the United States in San Ysidro, California without valid entry documents and was detained and interviewed by border patrol agents.  Ngana explained to them that he was harmed in Angola and feared returning; was not a member of a political party or group that was being persecuted in Angola; fled because of police brutality, poverty, and unemployment; and did not seek asylum in any of the countries he travelled through on his way to the United States. After Ngana was kept in detention for a few weeks, an asylum officer conducted a credible fear interview.

During the credible fear interview, Ngana said that he feared returning to Angola because he was threatened and harmed by police officers there.  Ngana claimed that, in 2014, Angolan police officers confiscated his phone for taking pictures of them in a stadium, searched it, found "videos of a revolutionary rapper" named Brigadeiro dez Pacotes, and detained him for seventeen to nineteen days. According to Ngana, it was a crime to support the rapper because he spoke "against

---

[1] Ngana did not administratively challenge the immigration judge's denial of CAT relief with the board.  Because he failed to exhaust this claim, we lack jurisdiction to review it. Amaya-Artunduaga v. U.S. Att'y Gen., 463 F.3d 1247, 1250 (11th Cir. 2006) ("We lack jurisdiction to consider a claim raised in a petition for review unless the petitioner has exhausted his administrative remedies with respect thereto.").

the revolution." Ngana said that, during his detainment, he was stripped of his clothes, tortured, and forced to wash police cars and sweep the yard because he "was speaking in bad terms of the president and the government." The officers, Ngana continued, released him only after he "signed a paper" stating that he would pay them money monthly. He said he was able to make two payments but, because he could not afford to make another payment, he escaped to another province in Angola, leaving his barbershop business behind. Ngana claimed to have stayed in the province for six months and then travelled to Brazil, where he remained for almost a year before he made his way to the United States. Ngana mentioned two more encounters with Angolan police officers during the interview. Ngana said that officers once doused him with boiling water at a park because he was waiting in line to buy one of the rapper's CDs. Another time, officers forced Ngana to give them free haircuts because he played the rapper's music in his barbershop. The asylum officer concluded that Ngana established a credible fear of persecution.

The government served Ngana a notice to appear, charging him with being removable as an alien not in possession of a valid entry document. Ngana admitted the allegation in the notice to appear and conceded his removability. Ngana applied for asylum, withholding of removal, and protection under the Convention Against Torture based on political opinion and membership in a particular social group. He claimed that he was mistreated and threatened by the ruling political party in

3

Angola—the People's Movement for the Liberation of Angola[2]—for his political opinions against the party and for his support of Brigadeiro dez Pacotes. In his application, Ngana recounted the three incidents with Angolan police officers in greater detail and claimed that he could not return to Angola because he feared that the MPLA would beat, jail, or kill him. Ngana also submitted the declaration of Gustavo Ngawina, another Angolan who was seeking asylum in the United States, the declaration of Dr. Jessica Auerbach, who was an expert on Angola's political conditions, and online news articles relating to Brigadeiro dez Pacotes. The government submitted the Department of State's 2018 Human Rights Report for Angola.

At his asylum hearing, Ngana testified about his support for Brigadeiro dez Pacotes and about the three run-ins with Angolan police officers in 2014. He testified that his first encounter with the police officers occurred at his barbershop because he was playing the rapper's music. Because of the music, the officers insulted him, threatened him, forced him to give them free haircuts, and confiscated his watch, CDs, and CD player. As for the second encounter, Ngana testified that police officers threw hot water on him because he was in line to buy one of the rapper's CDs at a local park. The hot water allegedly left him with severe burns, and he was unable to get medical treatment at the local hospital because it treated

---

[2] We will, like Ngana and the government, refer to this party as the MPLA.

only people with an MPLA identification card, which he did not have.  Finally, Ngana testified about the incident at the stadium.  He claimed that police officers arrested him and confiscated his phone because he was taking pictures of them "beating and torturing people that were trying to get in the stadium."  After finding the rapper's music on Ngana's phone, the officers decided to detain him for sixteen to nineteen days.[3]  During his detention, the officers beat Ngana with wooden sticks and belt buckles; stripped him of his clothes; forced him to clean police cars, the yard, and toilets; and didn't feed him for two days.  Ngana showed the immigration judge a scar he said resulted from the beatings.  He claimed that he purchased pain medicine upon his release as he "could not go to the hospital because of the unsafety."  Ngana said that, when he was released, the officers forced him to pay them a "big . . . lump sum of money" every two weeks and that a neighbor in Angola had helped him pay the police officers.  Ngana could not afford to make more payments after making the first two, so he moved to another province.  Ngana hid in another friend's barbershop for six months and then flew to Brazil after obtaining a one-year tourist visa.  He lived in Brazil for eleven months but said he left for the United States because of the gang violence.  Ngana recalled that a neighbor in Angola had called him to tell him not to return to Angola because the police were

---

[3] Ngana initially testified that he was detained for sixteen to nineteen days, but then stated sixteen to seventeen days.  And later, he acknowledged that he was detained between seventeen and nineteen days.

looking for him.  Ngana interpreted this to mean that the police would imprison or kill him if he returned.

After Ngana testified, the immigration judge discussed the lack of evidence corroborating his testimony.  The immigration judge stated, and Ngana agreed, that Dr. Auerbach's affidavit did not corroborate the "specific factual circumstances" concerning the incidents.  The immigration judge noted that Ngana did not present hospital records or evidence from his parents or friends that corroborated any of the incidents.

In response, Ngana claimed that he had burn scars that corroborated the park incident, but the immigration judge stated that the "[s]cars mean[t] absolutely nothing" because Ngana could have sustained them from something else.  As for hospital records, Ngana said that there were none because the hospital refused to treat him.  And as for corroborating evidence from family and friends, Ngana stated that he (1) had no evidence from his father, who did not live in Angola; (2) could not get evidence from his neighbor because the neighbor had been arrested and could not be found; and (3) had no evidence from the friend he stayed with for six months.

Ultimately, the immigration judge denied Ngana's application.  The immigration judge found Ngana credible but also found that Ngana did not "me[e]t his burden of providing reasonably available corroborating evidence."  Specifically, the immigration judge found that Ngana did not provide evidence that corroborated

his testimony about the incidents of persecution, such as letters from relatives or friends about the incident at the barbershop, documents about the hot water incident at the park, documents about the dates of the incidents, documents about his arrest and detention, documents from Brigadeiro dez Pacotes' supporters, medical records of his injuries, letters from the neighbor who loaned him money for his release, letters from others that Angolan police officers were collecting money from him, or a declaration from the friend he lived with for six months.  The immigration judge found that Ngana did not "show[] that it [was] unreasonable for him to provide corroborating documents," noting that his friend Ngawina, who was also detained in the United States, was able to obtain documents from individuals in Angola.  Finally, the immigration judge determined that, alternatively, Ngana had failed to establish past persecution, a well-founded fear of future persecution, or entitlement to protection under the Convention Against Torture.

Ngana appealed to the board and submitted additional evidence,[4] but the board dismissed his appeal.  The board stated that Ngana was "expected to submit reasonably obtainable evidence to corroborate the material elements of his claim" or "establish that corroborating evidence [was] not reasonably obtainable."  The board

---

[4] Ngana submitted (1) an affidavit from someone who attempted to contact Ngana's friends to obtain corroborating documents; (2) a sworn statement from a friend who saw Ngana after the park incident, found Ngana's barbershop destroyed, and learned that police had taken Ngana's neighbor; (3) an affidavit from someone who claimed that Angolan police officers had destroyed Ngana's barbershop; and (4) a letter from a friend who claimed to have visited Ngana after the park incident.

noted that the instructions on the asylum application notified Ngana of these expectations. Based on the totality of the record, the board agreed with the immigration judge that Ngana "did not provide sufficient corroboration" and "did not provide reasonable explanations for the utter absence of evidence corroborating the specifics of his claim." The board determined that "[t]he record contain[ed] no documentation from Angola corroborating the[] incidents, nor any declarations from individuals [Ngana] knew in Angola." As for Ngawina's declaration, the board noted that it did not establish whether the incidents occurred but, instead, "relate[d] to country conditions." The board agreed with the immigration judge that Ngana's scars corroborated the fact that he was injured "but not how or by whom they were inflicted." Finally, the board refused to consider the additional evidence Ngana submitted on appeal because it could not engage in fact finding or consider new evidence. Ngana timely petitioned this court for review.

## STANDARD OF REVIEW

We review only the board's decision "except to the extent that it expressly adopts the [immigration judge's] opinion." Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). Because the board "explicitly agreed" with several findings of the immigration judge, we review the decisions of both the board and the immigration judge on those issues. Ayala v. U.S. Att'y Gen., 605 F.3d 941, 948 (11th Cir. 2010). We review legal issues de novo and administrative factual findings

8

under the substantial evidence test. Id. Under the substantial evidence test, which is a highly deferential standard, we must affirm the board's decision "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 818 (11th Cir. 2004) (quotation marks omitted); see also Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1236 (11th Cir. 2006) (applying the same standard when reviewing the immigration judge's decision); Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005) ("[T]he [immigration judge's] administrative findings of fact are conclusive unless a reasonable factfinder would be compelled to conclude to the contrary."). We "view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc). Factual findings "may be reversed . . . only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal." Id.

## DISCUSSION

Ngana argues that there was no substantial evidence supporting the immigration judge's and board's determinations that he failed to satisfy his burden of proving his claims of asylum and withholding of removal because there was no corroborating evidence. To be eligible for asylum, the burden of proof is on Ngana

9

to establish that he is a "refugee."  8 U.S.C. § 1158(b)(1)(A).  Ngana is a refugee if he establishes "(1) past persecution on account of [membership in a particular social group or political opinion], or (2) a well-founded fear that [his membership in the social group or political opinion] will cause such future persecution."  Diallo v. U.S. Att'y Gen., 596 F.3d 1329, 1332 (11th Cir. 2010) (internal quotation marks and citation omitted).  Ngana must "demonstrate that his . . . fear of persecution is subjectively genuine and objectively reasonable."  Yang, 418 F.3d at 1202.  Ngana can satisfy the subjective component with "credible testimony that he . . . genuinely fears persecution."  Id.  And, "[i]n most cases, the objective prong can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution."  Id. (internal quotation marks and citation omitted).  To be entitled to withholding of removal, Ngana bears the burden of establishing that he would more likely than not be persecuted because of his political opinion or membership in a particular group, which is a "higher evidentiary threshold than the 'well-founded fear' standard for asylum."  Rivera v. U.S. Att'y Gen., 487 F.3d 815, 820 (11th Cir. 2007).  Consequently, "where an applicant is unable to meet the 'well-founded fear' standard for asylum, he is generally precluded from qualifying for either asylum or withholding of deportation."  Najjar v. Ashcroft, 257 F.3d at 1292–93 (internal quotation marks omitted).

10

In determining whether an applicant has carried his burden, "the trier of fact may weigh . . . credible testimony along with other evidence of record." 8 U.S.C. § 1158(b)(1)(B)(ii). An applicant's testimony alone "may be sufficient to sustain [his] burden without corroboration, but only if [he] satisfies the trier of fact that [his] testimony is credible, persuasive, and refers to specific facts sufficient to demonstrate" that he is eligible for relief from removal. Id. In deciding whether an applicant is credible, the trier of fact weighs various factors: the applicant's "demeanor, candor, or responsiveness"; "the consistency between the applicant's written and oral statements"; "the consistency of such statements with other evidence of record"; or "any other relevant factor." Id. § 1158(b)(1)(B)(iii). Overall, the trier of fact must consider the totality of the circumstances to make a "clean" credibility determination. Yang, 418 F.3d at 1201.

"The weaker an applicant's testimony, however, the greater the need for corroborative evidence." Id. In other words, "general or vague" testimony may require "specific and detailed corroborative evidence." Matter of Y-B-, 21 I. & N. Dec. 1136, 1139 (BIA 1998). Corroborative evidence is particularly important to "support . . . material facts which are central to [an applicant's] claim," and "[t]he absence of such corroborating evidence can lead to a finding that an applicant has failed to meet [his] burden." Matter of J-Y-C-, 24 I. & N. Dec. 260, 263 (BIA 2007) (quoting Matter of S-M-J-, 21 I. & N. Dec. 722, 725–26 (BIA 1997)). "Where the

11

trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence." 8 U.S.C. § 1158(b)(1)(B)(ii). And we may not reverse the fact finder's decision "with respect to the availability of corroborating evidence" unless we find that the record compels a conclusion "that such corroborating evidence is unavailable." Id. § 1252(b)(4).

First, Ngana argues that substantial evidence did not support the immigration judge's and board's determinations that Ngana's testimony alone was insufficient to satisfy his burden. Because his testimony was consistent, persuasive, and specific, Ngana contends, he didn't need to provide additional evidence to corroborate his testimony about his encounters with Angolan police. We disagree.

As we've noted, the extent of a witness's credibility varies based on whether his testimony is weak, strong, or something in between. See Yang, 418 F.3d at 1201. Here, the immigration judge determined that Ngana's testimony, while credible, fell on the "weaker" end of the spectrum because the testimony was in some instances unpersuasive, inconsistent, or not specific enough, all grounds that Ngana concedes would require him to provide corroborating evidence.

At the hearing, the immigration judge said that Ngana's "entire claim [was] based on generalities," noting that Ngana was unable to specifically identify anyone involved in his encounters with Angolan police. In addition, the immigration judge,

12

in his decision, stated that "much of the things that [Ngana] testified to in this case involved generalizations with the dates and time," as Ngana was unable to pinpoint what month the barbershop or park incidents occurred and was "inconsistent about when he left [Angola]." The immigration judge further believed that Ngana needed to produce evidence corroborating his testimony about the third incident because his post-release conduct was inconsistent with the severity of his detainment. Specifically, the immigration judge took issue with the fact that Ngana "was back to work within two or three days after" he was released from custody and took painkillers instead of getting professional treatment. Because substantial evidence supported the finding that Ngana's credible testimony was weak and thus insufficient by itself to meet his asylum burden, the immigration judge and board properly required that he provide evidence corroborating the "material facts" that were "central to [his] claim." Matter of J-Y-C-, 24 I. & N. Dec. at 263.

Second, Ngana contends that the additional evidence he presented—his scars, Dr. Auerbach's and Ngawina's declarations, and the online news articles— constituted "corroborating evidence, which, in combination with his credible testimony, [was] sufficient to satisfy his burden." The immigration judge's and board's findings to the contrary, he argues, were not supported by substantial evidence. We don't agree.

13

The "material facts . . . central to [Ngana's] claim[s]" were those pertaining to the three encounters Ngana had with Angola police. Id. Other than his own testimony, Ngana submitted Dr. Auerbach's declaration, which stated that "the MPLA has enjoyed near-universal power and control," the MPLA's "policing of those deemed to be against [it] is legendary[] and routinely extremely violent," Brigadeiro dez Pacotes "has been one of the most vocal critics of the MPLA-controlled state," those who enjoy the rapper's music "have been subject to extensive subjugation . . . by the MPLA," it is "relatively common place" for police to demand money, and those without an MPLA identification card are often blacklisted by the MPLA from healthcare. Ngana also submitted Ngawina's declaration, which verified that Brigadeiro dez Pacotes was "widely recognized" as a rapper and Angolan "revolutionary leader" who opposed the MPLA, "several Angolans all around the world" supported him and his group, and the Angolan government would likely kill Ngana if he returned. Finally, Ngana submitted news articles confirming that Angolan police officers were "purportedly prohibiting informal vendors [from] play[ing] music of the Angolan rapper [Brigadeiro dez Pacotes], due to its harsh criticism of the government and the President," and "silencing the merchants" playing his music by arresting them. The board correctly deemed these declarations and articles insufficient to satisfy Ngana's burden because they "relate[d]" only "to country conditions." While the declarations and articles may have described the

14

political tension between the MPLA and Brigadeiro dez Pacotes' supporters, they don't corroborate Ngana's contentions that, in 2014, officers actually raided his barbershop for playing the rapper's music, doused him with hot water at a park for buying the rapper's music, and detained and beat him for almost three weeks.

Likewise, substantial evidence supported the board's finding that Ngana's scars did not sufficiently corroborate his encounters with the Angolan police because there were reasons to cast some doubt on the severity of the beatings Ngana allegedly suffered. As the immigration judge pointed out at the hearing, Ngana was working again just a couple of days after he was released from custody and, rather than seek professional treatment, he bought painkillers at his local pharmacy. We also don't think that it was unreasonable for the immigration judge or board to require some corroboration on the origin of the scars or that such corroboration was an "extraordinary . . . demand[]." Id. Indeed, a declaration from a physician who could attest that his scars resembled those caused by burns or beatings, or from a friend or family member who witnessed his injuries around the time of the encounters, may have been sufficient and wouldn't have been unreasonably burdensome to obtain. See Hanaj v. Gonzalez, 446 F.3d 694, 696 (7th Cir. 2006) (finding that scars corroborated the petitioner's allegation of torture where he produced an affidavit from a board-certified family physician who stated that the petitioner's scars were "consistent with his allegations of the beatings").

15

Third, Ngana argues that the immigration judge "neglected to provide [him] with the opportunity to explain why he could not provide corroborating evidence," "failed to ensure that any such explanation . . . was included in the record," and "failed . . . to state a finding on the record as to whether [his] explanation was sufficient." The record does not support Ngana's position.

"[I]n circumstances where the [i]mmigration [j]udge determines that specific corroborating evidence should have been submitted, the applicant should be given an opportunity to explain why he could not reasonably obtain such evidence." Matter of L-A-C-, 26 I. & N. Dec. 516, 519 (BIA 2015); see also Uzodinma v. Barr, 951 F.3d 960, 966 (8th Cir. 2020) ("When an asylum applicant must provide corroborating evidence, the [immigration judge] must afford an opportunity to explain its unavailability, ensuring the explanation is in the record."). At Ngana's hearing, the immigration judge went through each of Ngana's run-ins with Angolan police and asked, at each step, whether Ngana had any corroborating evidence to further support his testimony. Ngana responded to the immigration judge's inquiry and provided reasons for not having more evidence to corroborate his testimony. One reason was that he believed the declarations, news articles, and scars were sufficient. The immigration judge then asked Ngana whether he had (1) medical records to support his injuries, (2) any declarations from his parents or friends, (3) a declaration from the person who loaned him money to pay the officers after his

16

detainment, and (4) a declaration from the person he stayed with for six months. Ngana explained that (1) he couldn't obtain the medical records because the hospitals only treated patients with an MPLA identification card, which he did not have; (2) he tried reaching his father, but his father didn't live in Angola; (3) the person who loaned him money had moved out of Angola; and (4) he didn't have anything from the friend he stayed with for six months after he fled his province. Moreover, the immigration judge addressed Ngana's lack of corroborative evidence on the record—specifically, in his final decision. The immigration judge stated that "[t]his [was] not a case where [Ngana] ha[d] shown that it [was] unreasonable for him to provide corroborating documents." The immigration judge noted that Ngana could have obtained declarations from family members, the owners of businesses neighboring his barbershop, fellow supporters that were with him during the park incident, or other friends who had knowledge of his encounters with Angolan police. We therefore reject Ngana's argument that the immigration judge did not adequately consider his explanations for not having evidence to corroborate his testimony.[5]

---

[5] Ngana asks us to grant his petition because the board failed to address his argument that the immigration judge erred in his alternative "conclusion that . . . Ngana's fear of future persecution was not objectively reasonable." But because Ngana failed to satisfy his burden of proof, and his uncorroborated testimony was the only evidence of fear of future persecution, he cannot meet his burden for asylum or withholding of removal. See Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287–88 (11th Cir. 2005) ("Because Forgue did not produce corroborating evidence for the [immigration judge] to consider and the [immigration judge] found his testimony was not credible, substantial evidence also supports the [immigration judge's] denial of Forgue's asylum application.").

17

**PETITION DENIED.**